THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v.
ROBERT SMITH, Defendant-Appellee.

First District (3rd Division)   No. 1—88—3360

Opinion filed September 25, 1991.

Jack O'Malley, State's Attorney, of Chicago (Inge Fryklund, Theodore Burtzos, and Paul Gliatta, Assistant State's Attorneys, of counsel), for the People.

Randolph N. Stone, Public Defender, of Chicago (Emily Eisner, Assistant Public Defender, of counsel), for appellee.

JUSTICE GREIMAN delivered the opinion of the court:

The circuit court of Cook County suppressed incriminating statements defendant Robert Smith made during a custodial interrogation by police, on grounds that they were secured by acts which violate defendant's right to counsel under the fifth amendment of the United States Constitution and article I, section 10, of the Illinois Constitution. The State appeals, contending the trial court improperly granted the motion to suppress.

We affirm the trial court.

We will consider two issues regarding the effect of continuous interrogation upon defendant's rights after he is taken into custody. The first issue is the admissibility of an incriminating statement made during a custodial interrogation in which defendant repeatedly requested counsel but was held *incommunicado*. The second issue is the admissibility of an incriminating statement made after counsel for defendant, present at the police station, repeatedly requested to speak with his client before any further interrogation took place.

On November 6, 1987, defendant was taken into custody in connection with the homicide and armed robbery of Beverly Magsby-Watkins. Defendant sought to suppress a statement obtained during 17 hours of overnight custodial interrogation without food, water, sleep and telephone. In his motion to suppress, defendant alleged that he was denied requests to consult with his attorney and telephone his family, and that the police repeatedly refused to permit his attorney to visit him.

Defendant alleged that the statement of confession was obtained in violation of his fifth amendment right to counsel during a custodial interrogation. Defendant argued that it was also an invalid waiver of his fifth amendment right to counsel since he had instructed that his attorney come to the station and his attorney was present at the station seeking access to the defendant. The motion also alleged physical coercion as a ground to support the suppression of the statement.

At the suppression hearing, attorney James Stamos testified that on November 7, 1987, between 1 p.m. and 1:30 p.m., he received a telephone call from defendant's sister, Patricia Smith. Smith told him that defendant was in the custody of Chicago police as a suspect in the death of Beverly Watkins. After confirming this with the police, Stamos called Smith and advised her that he was unable to represent her brother, having previously represented the

victim. Stamos then recommended Jack Rimland, an associate of his who practiced criminal law, who subsequently agreed to take the case.

Attorney Rimland testified that on November 7, 1987, after arriving at Area 2 police headquarters at 3:15 p.m. with the defendant's family, the group was told that defendant was upstairs. At 3:30 p.m., Detective Dwyer told the group that defendant would be charged only for "traffic warrants," and would not be charged with homicide. Rimland told Dwyer that he had been retained to represent defendant and that he wished to speak with his client immediately before any further questioning took place. Dwyer then repeated that no murder charges would be filed and that defendant would be downstairs momentarily.

Throughout the afternoon, Rimland attempted to contact the defendant, but was continually thwarted by police, who repeated that defendant would be brought downstairs momentarily. At 5:30 p.m., when Rimland made his eighth request to see his client, he was told by Sergeant Wilson that defendant was aware that Rimland and his family were present, but he did not wish to see them. Wilson told Rimland that defendant wanted to "get something off his conscience." Rimland continued to attempt to contact his client but he was refused access.

Late in the afternoon, Officers McGregory and Rice told Rimland that defendant had confessed to the homicide, and Rimland was allowed to see defendant at 7 p.m., speaking to him from behind a glass panel. Rimland stated it was at this time that defendant told him that he had asked repeatedly to make phone calls to his lawyer and to his family. Rimland learned of the signed confession at this time.

At the hearing, defendant testified he received a call at work from Detective Rice asking if defendant knew that his former girl friend had been killed, and asking defendant to come to the police station to help with some "leads." After several hours of questioning by police, defendant left the station and went to the home of his current girl friend, Kelly Matthews. Detective Rice later called defendant there, asking defendant if he would briefly return to the station. When the detectives came for him, he told Matthews that if he did not return by morning, to call his sister so she could contact his lawyer and direct him to go to the police station. Matthews corroborated this statement.

On his second visit to the police station, defendant was taken to the interrogation room where he was told that he would be required

to submit to a gunpowder residue test. Defendant testified that he first asked to make a phone call at approximately 1 a.m., after Detective Dwyer told him that he had "failed the gunpowder test." After being locked in the interrogation room for a long period of time, he asked Detective Rice if he might make a phone call, but his request was refused and police continued to interrogate him. Dwyer arrived later and took the keys to defendant's car.

Defendant testified that he was then left alone in the interrogation room for at least four hours. Detective Dwyer returned at 7 a.m. and advised defendant that broken glass and makeup had been found in defendant's car. He told defendant that he would be required to take a polygraph test, and if defendant complied, he would be allowed a phone call.

After the polygraph test, defendant testified that he renewed his request to call his lawyer, but Detective Dwyer did not allow him to do so. Defendant also told Detective Rice that he knew he had the right to make a phone call and continued to insist on making a phone call, but his continued requests were never granted.

Defendant stated he was never told by the police that his family and his attorney were at the station until after he signed the confession. Detective Rice told him if he wished to talk to anyone, whether a lawyer or his family, he would have to sign the statement. Defendant said he signed but did not read the statement. Defendant further alleged that he was repeatedly beaten during interrogation. However, the trial court explicitly concluded that defendant's allegation was not supported by the evidence; a photograph of defendant having been taken shortly after his arrest which showed no visible marks or bruises on his body. Defendant has not challenged this determination on appeal.

Detective Dwyer testified that when he spoke with defendant in the interrogation room, defendant gave permission for police to search his car and that defendant never asked him or any other officers for an opportunity to speak with his attorney. Dwyer acknowledged that he did not hold defendant in the interrogation room after 3 p.m. for outstanding traffic warrants.

Detective Rice testified that he had taken a written statement from defendant regarding the investigation and that he viewed the news tape from a local television station regarding the homicide, but did not find the information in it that defendant had earlier claimed to have gleaned from it. Moreover, the victim's friends refuted defendant's statements regarding the breakup of his relationship with the victim. Accordingly, he ascertained there was probable

cause as to defendant's involvement in the homicide. Thereafter Rice advised defendant of his *Miranda* rights in the interrogation room. Rice testified that defendant never requested a lawyer, but that defendant did say the next day that he wanted to tell him "the truth."

Officer Thomas Shine testified that he notified Detective Dwyer that Rimland was in the building requesting to see the defendant and that Dwyer knew Rimland was defendant's attorney. Shine told Rimland that Dwyer was conducting a lineup and defendant would be available after he was finished, but Shine denied being the officer who Rimland alleged had told him the lineup was a ruse.

Assistant State's Attorney Gus Munoz testified that he informed defendant of his constitutional rights and defendant gave him a statement which Munoz reduced to writing. Munoz said defendant never asked for an attorney and, in fact, indicated on several occasions that he did not want an attorney. The assistant State's Attorney also maintained that defendant never asked to make a phone call or suggest that he had asked to make a phone call.

The trial court found defendant was denied access to his family, to his attorney and to the outside via phone calls, as part of a plan executed by the authorities to detain defendant *incommunicado* until he made a statement.

The trial court further found it more probable than not defendant had told his girl friend to call his sister if he was not back from the police station by morning, thus finding he had asked for an attorney. This was certainly credible since the defendant's family appeared at the station in the morning although they had not been contacted by defendant, and defendant's sister had called an attorney for defendant. Defendant's fifth amendment rights, however, ought not to rest upon whether a defendant remembered to tell his sister to call a lawyer, but rather on the conduct of the sworn officers.

■ Generally an incriminating statement made by defendant in the course of an *incommunicado* custodial interrogation during which defendant repeatedly asked for counsel will not be deemed a voluntary statement waiving defendant's fifth amendment rights. As the trial court noted, *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, holds that before a statement may be used in evidence, the State must establish that the defendant made a knowing, intelligent and voluntary waiver of his fifth amendment rights. *Miranda* further points out, and the trial court acknowledged:

"Whatever the testimony of the authorities as to waiver of rights by an accused, the fact of lengthy interrogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights. In these circumstances the fact that the individual eventually made a statement is consistent with the conclusion that the compelling influence of the interrogation finally forced him to do so. It is inconsistent with any notion of a voluntary relinquishment of the privilege." *Miranda*, 384 U.S. at 476, 16 L. Ed. 2d at 724-25, 86 S. Ct. at 1629.

■ The trial court here found defendant was held 17 hours without being allowed to make a phone call under circumstances in which it is probable that he would request the opportunity to make such a call. The performance of gunpowder and polygraph tests, the search of defendant's car by police and the statement by police that defendant could likely be the person responsible for the homicide in all likelihood would have convinced defendant that he should seek legal assistance. The trial court gave scant credibility to the officers' statements that defendant never requested the use of a phone, especially considering the evidence of their other efforts to keep defendant *incommunicado* until he made a confession. Thus, the incriminating statements given by defendant were not made with a valid waiver of his fifth amendment rights and ought to be suppressed.

Under *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880, and its progeny, an accused who expresses a desire to deal with police only through counsel should not be subject to further interrogation without counsel present unless the accused himself initiates that further communication. (*Edwards*, 451 U.S. at 484-85, 68 L. Ed. 2d at 386, 101 S. Ct. at 1885; *Minnick v. Mississippi* (1990), 498 U.S. 146, 112 L. Ed. 2d 489, 111 S. Ct. 486.) A person facing custodial interrogation may assert his rights at any time (*People v. Christomos* (1988), 172 Ill. App. 3d 585, 527 N.E.2d 41), and if the utterances of the accused are "sufficiently free of indecision or double meaning to reasonably inform the authorities" that he wished to speak to counsel, then that person has invoked his fifth amendment protections. (*People v. Smith* (1984), 102 Ill. 2d 365, 376, 466 N.E.2d 236 (Simon, J., dissenting) *rev'd on other grounds* (1984), 469 U.S. 91, 83 L. Ed. 2d 488, 105 S. Ct. 490.) The invocation of the right to counsel is given a broad interpretation, and any doubts must be resolved in favor of protecting constitutional safeguards. *Michigan v. Jackson* (1986), 475 U.S. 625, 89 L. Ed. 2d 631, 106 S. Ct. 1404.

■ Defendant's confession must be suppressed for still another reason. A confession will be suppressed if the defendant's attorney was present at the police station, attempting to meet with his client and denied access until a confession has been extracted. (*People v. Smith* (1982), 93 Ill. 2d 179, 442 N.E.2d 1325.) In *Smith*, the court stated that when police, prior to, or during custodial interrogation, refuse an attorney appointed or retained to assist a suspect access to the suspect, there can be no knowing waiver of the right to counsel even if the suspect has not been informed that the attorney was present and seeking to consult with him. *Smith*, 93 Ill. 2d at 189.

Further, this court has upheld the principles of *Smith* in *People v. Visnack* (1985), 135 Ill. App. 3d 113, 481 N.E.2d 744. In referring to *Smith*, this court stated that if the defendant's attorney had been at the police station asking to speak with defendant, and if the police had not informed defendant of this fact, then any statement given by defendant after the police knew of the attorney's efforts to reach the defendant would not be admissible because defendant did not knowingly waive his right to counsel. (*Visnack*, 135 Ill. App. 3d at 119.) According to *Visnack*, the crucial question is whether the defendant's attorney was in fact present at the police station and asking to speak with defendant prior to defendant's confession, "because any statement obtained from defendant once the police learned of counsel's presence is inadmissible." *Visnack*, 135 Ill. App. 3d at 119.

Applying the principles found in *Smith* and *Visnack*, we agree with the trial court that defendant was not able to make a knowing and voluntary waiver because he was denied access to his attorney. Detective Dwyer and several officers were aware that Rimland was in the building continuously attempting to contact defendant. Moreover, Rimland made numerous attempts to gain access to defendant during the interrogation.

The facts of the case at bar parallel the *Smith* case. Both defendants were in custodial interrogation, both had an attorney known to them or retained in accordance with their instructions. Both attorneys were present and seeking to consult with their respective clients and both were denied access prior to the defendants making incriminating statements.

In interpreting this second issue, the State argues that the trial court improperly applied *Moran v. Burbine* (1986), 475 U.S. 412, 89 L. Ed. 2d 410, 106 S. Ct. 1135. In *Burbine*, a relative secured counsel for the suspect, who was unaware counsel had been retained. All communication by counsel with the police and prosecutors was by telephone, and counsel merely indicated to police by telephone that she

would act as the suspect's counsel if the police wished to place the suspect in a lineup or question him. Counsel in that case was told that the suspect would not be questioned until the next day, but was in fact interrogated later the same day and signed three written statements. Suspect was unsuccessful in suppressing those statements.

In interpreting *Burbine*, the Illinois Supreme Court, in *People v. Holland* (1987), 121 Ill. 2d 136, 520 N.E.2d 270, pointed out the distinction between an attorney retained by a suspect's relative but unknown to the suspect, who communicates with police by telephone and merely indicates a position as suspect's counsel; and an attorney retained by or known to a suspect, who is physically present at the place where the suspect is being held and questioned and who requests to see his client. (*Holland*, 121 Ill. 2d at 153.) That finding is consistent with the *Smith* holding that a suspect who has retained an attorney must be told that his attorney is present and wishes to consult with him, or there is no waiver of counsel.

The question as to whether defendant must have personally retained the lawyer or directed that the lawyer be retained remains murky in all of the cases cited. The question should not turn on who has retained or asked for the lawyer. It is enough that a lawyer is present, claims to have been engaged to represent the defendant and seeks access to him. To hold otherwise would allow the police to determine the extent and existence of an attorney-client relationship.

In *Holland*, defendant's counsel spoke with the interrogating officers by telephone to advise them of the fact that he now represented defendant, but apparently failed to request access. The majority determined that defendant's counsel did not seek access and was not present at the place of interrogation so that the interrogation and subsequent confession of defendant was not contaminated. Justice Clark, specially concurring, however, agreed that counsel had not requested access, but expressed his strong view that counsel's presence at the place of interrogation ought not be the salient fact that places a duty on police officers to advise defendant that his counsel is seeking access to him and terminating the interrogation.

The Clark concurrence would break the lock step trend of concurrent overlay of our State constitutional protections with those of the Federal Constitution. The *Holland* majority clearly believed that article I, section 10, of the Illinois Constitution of 1970 did not go beyond the holding in *Burbine* construing the Federal Constitution.

The *Holland* majority distinguishes between personal visits and telephone calls by an attorney. In the instant case we are not troubled with that distinction since defendant's counsel appeared at the police

station and continuously demanded access to his client. The testimony is clear that not only was he denied access, but that the police provided him with misinformation as to their future actions with respect to the defendant, the charges which might be brought against him and the defendant's state of mind.

The cogent statement in the *Holland* concurrence directed against denying access to retained counsel is worthy of repetition:

"From time immemorial the practice of holding suspects *incommunicado* has been rightfully abhorred. Courts have viewed with suspicion efforts to prevent lawyers from meeting with their arrested clients, even where the client has not formally invoked his right to meet with the lawyer. In fact, continued interrogation of a client who has not been informed of his attorney's contemporaneous efforts to meet with him has been nearly universally condemned.

The endorsement of such interrogation inevitably degrades and deforms our adversary system of criminal justice. It encourages law enforcement officials to treat the defendant's attorney as a supernumerary figure, an inconsequential busybody whose efforts on behalf of his client can be—and undoubtedly will be—rejected with contempt. It simultaneously weakens the client's ability to make a knowing and intelligent waiver of his rights by depriving him of a critical piece of information.

Such interrogation conflicts with an adversarial system of justice. It offends against traditional notions of justice and fair play." *Holland*, 121 Ill. 2d at 166 (Clark, J., concurring).

We find the trial court's interpretation of *Burbine* and *Holland* appropriate and its application of *Smith* to these facts to be accurate.

Accordingly, with respect to both of the issues considered, we affirm the trial court's ruling that defendant's fifth amendment right to counsel was violated, rendering defendant's statement inadmissible.

Affirmed.

CERDA, P.J., and RIZZI, J., concur.